UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FILED

05 APR 25  PM 6: 07

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

LEON DASH,

               Defendant.

U.S. DISTRICT COURT

REPORT & RECOMMENDATION

04-CR-6058T

## BACKGROUND

By Order dated April 8, 2004, all pre-trial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 5).

Defendant Leon Dash (hereinafter "Dash") is charged in a nine-count superseding indictment. The first through fifth counts relate to events occurring on April 27, 2003. Specifically, Count One charges that on that date Dash knowingly possessed two firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(C)(1). The second count charges that Dash possessed with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Count Three charges that Dash possessed in excess of five grams of cocaine base, in violation of 21 U.S.C. § 844(a). Count Four charges that Dash possessed with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). The fifth count charges that Dash possessed two firearms after having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The sixth count of the Superseding

Indictment charges that on March 23, 2004, Dash possessed a firearm after having been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The final three counts relate to events occurring on March 27, 2004. Count Seven charges that on that date Dash possessed with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). The eighth count charges that Dash possessed in excess of five grams of cocaine base, in violation of 21 U.S.C. § 844(a). The final count of the Superseding Indictment charges that Dash possessed with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D).

Currently pending before this Court are Dash's motions to suppress tangible evidence, statements and a photographic identification.[1] (Docket # 25). Each of Dash's motions will be discussed in turn below.


**FACTUAL BACKGROUND**

On January 3, January 27, and March 2, 2005, this Court conducted a suppression hearing on Dash's motions to suppress. (Docket ## 33, 34, 36). The subject of the hearing was events occurring in April 2003 and March 2004. Specifically, Officer Naser Zenelovic of the Rochester Police Department ("RPD") testified concerning an incident at 242 Parkway Street on April 27, 2003, and a subsequent search of that residence. RPD Investigator David Mace testified regarding statements made by Dash later that day. Investigator Thomas Donovan of the

---

[1] Dash's omnibus motion also sought, *inter alia*, discovery and inspection, *Brady* material, *Jencks* material, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence, and the preservation of rough notes. (Docket # 25). Each of these requests was either resolved by the parties or decided in open court by the undersigned on December 2, 2004. (Docket # 27).

RPD testified with regard to an identification procedure conducted nearly one year later, on March 23, 2004. Officer Gus Venosa of the RPD testified concerning Dash's arrest on March 27, 2004, and Investigator Nicholas Mazzola testified concerning his post-arrest interview of Dash.

**Testimony of Officer Naser Zenelovic:** Officer Zenelovic testified that at approximately 8:56 p.m. on April 27, 2003, he arrived at 242 Parkway Street following a report that a female victim was being held against her will by a male with a gun. (Tr.B 9-10).[2] While traveling to the scene, Zenelovic made a telephone call and spoke with the woman who had reported the crime, Quiana Barton ("Barton"). Barton advised him that Dash, who was her baby's father, was currently in the apartment with their baby and that he had a gun inside the apartment. (Tr.B 10). Barton further advised that Dash had been in her apartment since 5:00 a.m.

Upon arrival at 242 Parkway Street, Zenelovic met Barton in front of the neighboring residence. Barton explained that she and Dash had had a "dispute over a love triangle" involving another woman. (Tr.B 11). According to Barton, the argument began at approximately 5:00 a.m. Dash reportedly forced Barton into the apartment and threatened her with a gun, which he kept under the mattress. At approximately 4:00 p.m., Barton was able to leave the apartment by telling Dash that she was getting juice for the baby. Once outside, Barton notified a family member, who came to the residence between 8:00 and 8:30 p.m. At that time,

---

[2] The transcript of the suppression hearing conducted before this Court on January 3, 2005, shall hereinafter be referenced as "Tr.A ___." (Docket # 33).

The transcript of the suppression hearing conducted before this Court on January 27, 2005, shall hereinafter be referenced as "Tr.B ___." (Docket # 34).

The transcript of the suppression hearing conducted before this Court on March 2, 2005, shall hereinafter be referenced as "Tr.C ___." (Docket # 36).

3

Barton managed to leave the apartment again and she called 911 from a neighbor's telephone. (Tr.B 11).

After learning the above information from Barton, Zenelovic waited with her as other officers secured the perimeter of 242 Parkway Street. Zenelovic described the residence as a three-family dwelling. According to Zenelovic, the front door led to Apartment 1, which was Barton's apartment and the apartment in which Dash was present at that time. (Tr.B 12-13, G.Ex. 4). Two other apartments at that address were accessible through separate entrances. Barton's apartment also had a basement, which was accessible both through an inside door and a chained and locked outside door. (Tr.B 14).

Zenelovic waited with Barton for approximately twenty-five to thirty minutes, after which Zenelovic heard Officer Jobier on the front porch yelling for someone to "show their hands." (Tr.B 15). Zenelovic approached the front apartment and observed Dash in the doorway. Zenelovic then ran towards Dash, grabbed his hands, pulled him off the porch and handcuffed him. He was searched following his arrest and $717 in cash was found in his pocket. (Tr.B 21). Barton subsequently confirmed to Zenelovic that the apprehended individual was Leon Dash and that he was the father of her baby. (Tr.B 16). She further indicated that Dash lived in the apartment with her and their baby. (Tr.B 17).

Once Dash was secured, Zenelovic requested from Barton consent to search the apartment for guns. Barton agreed and was provided with an RPD "Consent to Search Form," which she read and signed. (Tr.B 17, G.Ex. 5). Zenelovic also signed the form as a witness, as did Officer Santori. (Tr.B 18).

4

Zenelovic thereafter began a search of the residence. As he searched, Barton followed him around the apartment. According to Zenelovic, Barton never objected to the search of any particular area, including the basement. (Tr.B 19-20). Indeed, Barton identified for Zenelovic the door that led to the basement and then followed him as he entered the basement to search. (Tr.B 20). Zenelovic observed that there were no other doors from the basement leading to any of the other apartments. (Tr.B 20). In the basement, Zenelovic discovered two handguns wrapped in handkerchiefs. (Tr.B 21, 36). Zenelovic also discovered ammunition upstairs in the apartment that did not fit either of the two handguns found in the basement. (Tr.B 36). Upon cross-examination, Zenelovic also testified that he discovered glassine bags in the basement and upstairs in the apartment.

After his discovery of the firearms, Zenelovic sat with Barton in the kitchen as he waited for a technician to arrive to recover the evidence. As they waited, Zenelovic assisted Barton in preparing a supporting deposition. Once the statement was completed, Barton read it, agreed that it was accurate, and signed it. (Tr.B 22, G.Ex. 6).


**Testimony of Investigator David Mace:** Investigator Mace testified that his first contact with Dash was on April 27, 2003, in an interview room at the Public Safety Building. (Tr.B 45). At approximately 11:27 p.m., Mace entered the interview room in which Dash had been placed and observed Dash sleeping on the floor. (Tr.B 45). Mace woke Dash, introduced himself, and asked him whether he wanted a drink of water or needed to use the restroom. Dash was permitted a drink of water and the use of the restroom. (Tr.B 45).

5

After returning from the restroom, Mace began gathering Dash's biographical information. Dash indicated that he had completed the tenth grade at Lofton High School and that he could read and write. Dash further stated that he had not had any alcohol that evening, that he had smoked "weed" earlier in the day, but that he was not under the influence of drugs at that time. Mace also asked Dash whether he lived on Parkway Street. Dash responded that he did not live at 242 Parkway Street, but rather lived at 68 Earl Street. (Tr.B 46, 60). Once he received the above information, Mace noted Dash's answers on the pedigree portion of a Rochester Police Department *Miranda* card. (Tr.B 47-48, G.Ex. 7).

Following these questions, Mace testified that he advised Dash of his *Miranda* rights by reading the warnings from the *Miranda* card. (Tr.B 49). Afterwards, Mace asked Dash whether he understood his rights and whether he was willing to speak at that time. Dash responded affirmatively to both questions. (Tr.B 50). Mace then proceeded to question Dash regarding the incident occurring earlier that day at 242 Parkway Street and the firearms discovered in the basement. Dash explained that two women arrived at the house at 5:00 a.m. that morning. One of the women was looking for a cellular telephone from Quiana. Quiana became upset when she realized Dash had been seeing another woman. As a result, Dash and Quiana argued for the rest of the day. (Tr.B 52-53). Dash also informed Mace that he was unemployed and that his mother provided him with money for the baby. Dash denied, however, that the firearms discovered in the basement at 242 Parkway Street belonged to him and suggested that they had been planted. (Tr.B 53).

At one point during the interview, Mace left the room to speak with another officer in order to learn whether additional evidence had been discovered during the search.

(Tr.B 54). Mace returned to the interview room approximately one-half hour later with a copy of the deposition signed by Quiana Barton. (Tr.B 55). Mace sat down with Dash and read the deposition aloud. When Mace was finished, Dash responded by saying, "She's just mad." Mace thereafter continued to question Dash regarding the firearms. Dash repeatedly denied knowledge of the firearms, stating that "if he was going to hide drugs or a gun, he would hide them in a car." (Tr.B 55). Finally, at approximately 1:03 a.m., Dash stated, "take me to booking," and put his head down on the table. (Tr.B 55). At that time, Mace discontinued the interview. (Tr.B 55).

According to Mace, throughout the seventy-five minute interview, Dash acted in a calm, polite manner. Dash responded to the questions posed to him and did not appear to be under the influence of drugs or alcohol. (Tr.B 56-57).

**Testimony of Investigator Thomas Donovan:** Investigator Donovan testified concerning a separate incident occurring almost one year later. According to Donovan, on March 23, 2004, at approximately 8:15 p.m., he received a broadcast over his police radio that there had been a report of a man with a gun at 551 North Goodman Street. (Tr.A 9). Donovan reported to the scene and was advised by other officers that a foot chase had ensued involving an individual known as "Moosey." During the pursuit, Moosey had reportedly thrown a handgun. (Tr.A 9-10). Another officer at the scene informed Donovan that Moosey's real name was Leon Dash. (Tr.A 10).

Shortly thereafter, Donovan entered the name "Leon Dash" into the Morris computer system. Because Dash had been entered into the system on a prior occasion, Donovan was able to retrieve a physical description of Dash and relevant biographical information. (Tr.A

7

23). Based upon such information, the computer generated a photographic array containing Dash's photograph and photographs of other individuals with similar physical characteristics. (Tr.A 10, 23, G.Ex. 1). Donovan chose among the more than twenty photographs provided and created a six-photograph array. (Tr.A 21). Upon completion, Donovan provided the array to Officer Gourlay and asked him to review it.

At approximately 9:54 p.m., Donovan proceeded to speak with Abdul Shaibi, who had witnessed the earlier incident. (Tr.A 13). Donovan informed Shaibi that he was going to show him a set of pictures and advised him that the individual he saw may or may not be depicted. Donovan further instructed Shaibi to review the array and to indicate whether he recognized any of the individuals, and, if so, to indicate the basis of his recognition. (Tr.A 14). Donovan subsequently provided the array to Shaibi, who reviewed it and pointed to photograph number two, stating "that's him." (Tr.A 14). Donovan asked who the person was and Shaibi responded, "Moosey." (Tr.A 14). After the positive identification, Donovan placed a circle around photograph number two and instructed Shaibi to initial the circle. Shaibi responded by signing his name next to the circled photograph and then signed and dated the bottom of the array. (Tr.A 14-15).

Once the identification procedure was complete, Donovan testified that he assisted Officers Gourlay and Schoenl as they prepared a felony wanted package for Dash. (Tr.A 16). A felony wanted package, which is not reviewed by a judicial officer at the time of its preparation, identifies a particular individual for whom the police believe probable cause to arrest exists, as well as the offense(s) for which that individual is sought. In this case, the package indicated that there was probable cause to arrest Dash for possession of a weapon. The package

8

included a crime report, the photograph identified by the witness, a felony information and paperwork for the court. (Tr.A 16, 17-18).

Information relating to Dash was then placed on the "wanted board" in the "on-call" room at the Rochester Police Department. Such information included Dash's photograph, name, date of birth, last known address and known vehicles. Once the information was placed on the wanted board, it could be used by the city records unit to advise any officer who stopped Dash that he was wanted. (Tr.A 17).

**Testimony of Officer Gus Venosa:** Officer Venosa is assigned to the Apprehension Division of the Rochester Police Department. According to Venosa, once a felony package has been completed, it is "fielded," which means that it is turned over to the Apprehension Division.

With respect to this case, Venosa explained that at some time prior to March 27, 2004, a felony package for the criminal possession of a weapon had been completed for Dash and was "fielded" for his arrest. (Tr.C 5-6). Based upon the wanted package, Venosa and his partner, Edwin Morale, began an investigation to locate Dash. (Tr.C 6-7). During the course of the investigation, Venosa received information that on March 27, 2004, Dash would be at a particular location during a specified time frame. (Tr.C 8). In response, Venosa and Morale conducted surveillance in the area of Goodman Street and Norton Street. According to Venosa, at approximately 10:00 p.m., a sport utility vehicle ("SUV") pulled into a parking lot across the street from Venosa's location, approximately fifty yards away. An individual, later identified as Dash, stepped out of the passenger side of the vehicle. (Tr.C 8-9, 21). Dash approached a

smaller four-door car and spoke briefly to someone in that vehicle.  (Tr.C 8).  Dash then returned

to the SUV and both cars drove away.  (Tr.C 9-10).  The SUV pulled out onto Goodman Street

heading northbound.  (Tr.C 10).  Venosa broadcast a description of the vehicle, including the

license plate number.  (Tr.C 10).  Approximately one to one and one-half minutes later, a traffic

stop of the SUV was conducted by uniformed officers pursuant to Venosa's instruction.  (Tr.C

10-11).  Initially, the driver was removed from the SUV and then Dash was ordered to get out.

Venosa testified that between his first sighting of Dash and Dash's arrest, he never lost sight of

him.  (Tr.C 11).


**Testimony of Investigator Nicholas Mazzola:**  Investigator Mazzola testified

concerning his interview of Dash following the March 27, 2004 arrest.  Specifically, Mazzola

stated that on that date, he was informed that an individual by the name of Leon Dash had been

taken into custody, was wanted on a gun charge, and needed to be interviewed regarding a

separate gun incident.  (Tr.A 33).  Mazzola arrived at the Monroe County Public Safety Building

for the purpose of conducting the interview.  (Tr.A 33-34).  Mazzola entered the interview room

at approximately 11:44 p.m. and introduced himself to Dash.  (Tr.A 34, 36).  Following the

introduction, Mazzola completed the pedigree portion of a Rochester Police Department *Miranda*

card.  He questioned Dash concerning his educational level, and Dash indicated that he had

attended East High School until the tenth grade.  Dash further indicated that he could read and

write.  (Tr.A 37).  Mazzola noted Dash's answers on the back of the *Miranda* card and then

advised him of this *Miranda* warnings by reading verbatim from the card.  (Tr.A 36-38, G.Ex. 2).

After reading the warnings, Mazzola asked Dash whether he understood the rights and whether

he was willing to speak. Dash responded affirmatively to each question, which Mazzola noted on the card. (Tr.A 38). According to Mazzola, at no time during his reading of the rights did Dash indicate that he did not understand his rights, nor did he request the opportunity to speak with an attorney. (Tr.A 38-39).

Once Dash had been advised of his rights and had agreed to speak, Mazzola initiated the interview. (Tr.A 39). After obtaining a general understanding of Dash's account, Mazzola instructed him to repeat the statement, which Mazzola then transcribed. (Tr.A 39). After completing the written statement, Mazzola asked Officer Venosa to enter the interview room as a witness. Mazzola then sat next to Dash and read the statement aloud, as Dash apparently followed along. Mazzola asked Dash whether the written statement was accurate and whether he wanted to add anything. Dash indicated that there was additional information he wanted to include, which Mazzola then added to the statement. Mazzola reread the statement to Dash and Dash acknowledged its accuracy and stated that there was nothing further he wanted to add. (Tr.A 39. G.Ex. 3A).

Once completed, Mazzola asked Dash to sign the written statement. Dash replied that he wanted to talk to Marchello Green to make sure he was not going to jail. Mazzola then brought Green into the interview room and permitted Dash to speak with him. After Green left, Dash again indicated that the written statement was accurate but stated that he did not want to sign it. (Tr.A 39-40). Based upon such refusal, Mazzola signed the statement and asked Officer Venosa to do the same. (Tr.A 40).

According to Mazzola, the entire interview lasted approximately forty-five minutes. At no time during that period, Mazzola testified, did Dash appear to be suffering from a

11

physical ailment or impairment. (Tr.A 34). Moreover, in Mazzola's opinion, Dash did not

appear to be under the influence of alcohol or a controlled substance. Dash spoke in a coherent

manner and never indicated any confusion. Finally, Mazzola testified that no threats or promises

were made to induce Dash to offer a statement. (Tr.A 34-35).

## DISCUSSION

Before this Court are four distinct suppression motions. First, Dash moves to

suppress tangible evidence seized during the search at 242 Parkway Street on April 27, 2003.

Second, Dash moves to suppress his initial statement to Investigator Mace on April 27, 2003, in

which he indicated that he had used marijuana earlier in the day. Dash's third motion is for the

suppression of the photographic identification made on March 23, 2004. The final motion raised

by Dash is for the suppression of statements made to Investigator Mazzola on March 27, 2004.

(Docket ## 25, 37). For the reasons that follow, I recommend that Dash's motion to suppress

tangible evidence, the photographic identification and statements made to Investigator Mazzola

be denied. It is also my recommendation that Dash's motion to suppress his pre-*Miranda*

statement to Investigator Mace concerning drug use be granted.

## I.  Motion to Suppress Tangible Evidence

Dash moves to suppress all evidence seized from the basement at 242 Parkway

Street on the grounds that it was seized pursuant to a warrantless non-consensual search. While

Dash acknowledges that Ms. Barton consented to the search, he argues that such consent was

limited to the ground floor of the apartment and did not include the basement. Dash claims that

Officer Zenelovic's search of the basement exceeded the scope of Barton's consent and thus requires suppression of the evidence recovered therefrom.

The Fourth Amendment mandates that a police officer must obtain a warrant before conducting a search, absent exigent circumstances or some other applicable exception. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)). A warrantless search, however, is permissible if based upon the voluntary consent of a person authorized to provide consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996). Such consent may be given either by the owner of the property that is to be searched, *Schneckloth*, 412 U.S. at 222, or by a third party possessing common authority over said property. *See United States v. Matlock*, 415 U.S. 164, 171 (1974).

The consent need only be voluntary, that is, obtained without coercion, and the resident need not be advised of his or her right not to consent. *See Schneckloth*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). It is the government's burden to prove by a preponderance of the evidence that the consent was voluntary. *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981), *cert. denied*, 454 U.S. 830 (1981).

The issue of voluntariness is to be determined based upon the totality of the circumstances. *Schneckloth*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990). "Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted),

13

*cert. denied*, 511 U.S. 1130 (1994).  The standard used to determine the voluntariness of an

individual's consent is an objective one.  *United States v. Garcia*, 56 F.3d at 423.

    A review of the suppression hearing testimony demonstrates that Officer

Zenelovic responded to 242 Parkway Street on April 27, 2003, following a report that a female

victim was being held against her will by a male with a gun.  (Tr.B 9-10).  Following Dash's

arrest, Zenelovic spoke with Ms. Barton, the resident of the apartment at issue.  Barton informed

Zenelovic that she lived in the apartment with Dash and their baby, and that Dash kept a gun

inside the apartment.  (Tr.B 10, 17).  Following their conversation, Zenelovic asked Barton

whether she would consent to a search of the apartment for guns, and Barton agreed.  (Tr.B 17).

Barton then read and signed an RPD consent to search form.  (Tr.B 17, G.Ex. 5).  Specifically,

that form read:

> I, Quiana Barton consent to have my premises . . . searched by the
> police.  I do agree and consent to have Officer Zenelovic, or any
> member of the Rochester Police Department, conduct a complete
> search of[] my home for any guns.

(G.Ex. 5).

    On the reverse side of the consent form, Barton signed a statement indicating:

> I am giving permission to these members of the Rochester Police
> Department to take any item, materials or other property which
> they may desire.  The permission is being given by me to members
> of the Rochester Police Department voluntarily, and without fear,
> threats, or promises of any kind.

(G.Ex. 5).  Nowhere on the consent form did Barton limit the scope of her authorization to

search.

    Following Barton's consent, Zenelovic initiated a search of the residence.  As he

did so, Barton followed him throughout the apartment.  (Tr.B 19).  When Zenelovic approached

one of the doors, Barton identified it as the entrance to the basement. (Tr.B 19-20). According to Zenelovic, Barton neither protested when he entered the basement, nor did she ever ask that he stop searching the basement. (Tr.B 20).

Considering these facts in their totality, I find that as a resident of 242 Parkway Street, Burton had the authority to consent to the search of that residence, and that such consent was the product of her free and unconstrained choice. I find no basis for Dash's assertion that Barton limited her consent to the main floor of the apartment. The consent form signed by Barton specifically authorized "a complete search of [her] home for any guns." (G.Ex. 5). No limitations were noted on the written form signed by Barton. Moreover, Barton's identification of the door leading to the basement and the fact that she followed Zenelovic into the basement without protest further supports the conclusion that Barton did not intend to limit the scope of her consent. "The failure . . . to object to the continuation of the search is a strong indication that the search was within the scope of the consent which [the resident] intended to give." *See United States v. Bruckman*, 1991 WL 255370, *3 (W.D.N.Y. 1991) (although defendant's wife signed consent form authorizing only search of the "upper flat," her actions of following searching officers into the attached basement without protest demonstrated her consent to search that area as well) (citing *United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986) (failure to object to continuation of search demonstrates that search is within scope of consent); *United States v. Sierra-Hernandez*, 581 F.2d 760, 764 (9th Cir.) (same), *cert. denied*, 439 U.S. 936 (1978)). Thus, I recommend that Dash's motion to suppress evidence seized from 242 Parkway Street be denied.

## II. <u>Motion to Suppress Photographic Identification</u>

Dash also seeks suppression of the photographic identification made by Abdul Shaibi on March 23, 2004. Dash contends that the photographic array presented to Shaibi was impermissibly suggestive because it was designed in such a way as to increase the likelihood of an identification. (Docket ## 25, 37). Specifically, Dash argues that the photographic array was unduly suggestive because his was the only photograph to depict an individual with a full goatee, as opposed to the other individuals who wore only mustaches. Dash also claims that the location of his photograph in the number two position – the middle photograph in the top row – rendered the array suggestive because "[t]he eye is naturally drawn to [that] place in the array." (Docket # 37 at 8).

The Supreme Court, in *Manson v. Brathwaite*, 432 U.S. 98 (1977), established that under the Due Process Clause, a defendant has the right not to be subjected to an identification procedure that creates a "very substantial likelihood of irreparable misidentification." *Id.* at 116 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). In determining whether to exclude a pre-trial identification, the court must undertake a two-step analysis. First, the court must consider whether the identification process was unduly suggestive. If so, the court must then determine whether the identification nevertheless possessed "sufficient aspects of reliability." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.), *cert. denied*, 434 U.S. 872 (1977). "Even if the procedure was unnecessarily (or impermissibly) suggestive, therefore, a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *United States v. Bautista*, 23 F.3d

726, 729-30 (2d Cir.) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

This Court has reviewed the photographic array in question (G.Ex. 1) and, despite Dash's assertions to the contrary, I do not find that the eye is "naturally drawn" to his photograph. Each photograph, commonly referred to as a "mug shot," is a frontal image of a male's face, neck and part of his shoulders. All of the men appear to be of similar age and coloring, and are of similar size and build. With regard to Dash's challenge that the location of his photograph in the number two position renders the array suggestive, such claim is unfounded. Dash has not provided any authority, nor has this Court found any, to suggest that the location of a photograph within an array is sufficient to demonstrate a substantial likelihood of misidentification. *See United States v. Jones*, 1986 WL 4549, *8-9 (S.D.N.Y. 1986) (rejecting argument that mere placement of defendants' photographs in the number two positions rendered arrays suggestive, but finding that use of the number two position for both arrays increased likelihood of suggestibility).

To the extent that Dash alleges that his photograph was the only one of a male with a full goatee, this Court simply disagrees. According to my review, at least three of the photographs (including Dash's) depict individuals wearing well-defined goatees. The remaining three individuals clearly have mustaches and some additional facial hair on their chins. (G.Ex. 1). While the exact amount of facial hair worn by each individual is not identical, this difference certainly does not make Dash's photograph stand out among the others "as to suggest to [the] identifying witness[es] that [Dash] was more likely to be the culprit." *United States v. Thai*, 29 F.3d 785, 808 (2d Cir.), *cert. denied*, 513 U.S. 977 (1994). *See United States v. Eltayib*, 88 F.3d

157, 166 (2d Cir. 1996) (quoting *United States v. Thai*, 29 F.3d at 808). *See also United States v. Bautista*, 23 F.3d at 731 (photographic array was not impermissibly suggestive despite fact that defendant's photograph was slightly brighter and more close-up than the others).

The Due Process Clause does not demand that all of the photographs in the array be uniform with respect to a given characteristic. *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986). Law enforcement is not required "to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility." *United States v. Bubar*, 567 F.2d at 199 (finding insufficient that focus and contrasts were sharper in defendant's photograph and that narrow strip of light ran across the picture above defendant's head). *See also United States v. Gibson*, 135 F.3d 257, 260 (2d Cir. 1998) (rejecting argument that photographic array was unduly suggestive because defendant was only individual depicted "with a goatee while all other men portrayed were clean-shaven"); *Arkin v. Bennett*, 282 F. Supp. 2d 24, 32-33 (S.D.N.Y. 2003) (fact that defendant had "Van Dyke" style beard while other photographs depicted individuals wearing only mustaches did not render array suggestive); *Dingle v. Scully*, 1990 WL 252285, *6 (E.D.N.Y. 1990) ("minor differences, especially with respect to characteristics easily altered, such as hair length or amount of facial hair, are not fatal to the fairness of a spread"); *United States v. Porter*, 430 F. Supp. 208, 212 (W.D.N.Y. 1977) ("fact that defendant was the only one in lineup with facial hair other than a mustache does not render the identification procedure impermissible suggestive").

Based upon the above-cited authority, I find that the photographic array utilized in this case was not impermissibly suggestive.[3]  Accordingly, it is my recommendation that Dash's motion to suppress evidence relating to the identification by Mr. Shaibi be denied.

## III.  Motions to Suppress Statements

In his final two motions, Dash moves to suppress statements made to Investigator Mace on April 27, 2003, and to Investigator Mazzola on March 27, 2004.  According to Dash, the statements made on both dates were obtained in violation of his constitutional rights against self-incrimination.  (Docket ## 25, 37).

**A.  Statements Made to Investigator Mace on April 27, 2003:**  Investigator Mace testified that he began the interview on April 27, 2003 by gathering Dash's background information and noting such information on the back of a *Miranda* notification card.  (Tr.B 46, 48-49)  First, Mace questioned Dash concerning his educational level, to which Dash replied that he had completed the tenth grade.  Mace further questioned whether he could read and write, and Dash indicated that he could.  Mace also testified that he asked Dash "if he was smoking any drugs or taking any drugs or drinking."  According to Mace, Dash responded that he had "had weed earlier in the day, but wasn't high now, hadn't been drinking any alcohol."  Finally, Mace questioned Dash regarding whether he lived on Parkway Street, to which Dash replied that he did not.  (Tr.B 46).  It was not until after Mace conducted the above questioning that he advised Dash

---

[3]  Having found that the pre-trial identification was not unnecessarily suggestive, this Court need not address the question whether the identification was reliable. *Bautista*, 23 F.3d at 731 n. 7 (citing *Brayboy v. Scully*, 695 F.2d 62, 65 (2d Cir. 1982), *cert. denied*, 460 U.S. 1095 (1983)).

of his *Miranda* warnings. (Tr.B 49). Dash subsequently waived his rights under *Miranda*, and Mace conducted a formal interview.

Now before this Court is Dash's motion to suppress statements made to Investigator Mace. Dash does not, however, seek to suppress all statements, nor does he challenge the voluntariness of his eventual *Miranda* waiver. Rather, Dash challenges only his response to Mace's inquiry as to whether he had smoked any drugs or consumed any alcohol. Dash contends that his reply that he had smoked "some weed" earlier, but that he was not "high" at the time, was an incriminating response elicited by Mace's question, and thus should be inadmissible because it was not preceded by *Miranda* warnings.[4]

In *Miranda*, the United States Supreme Court held that the government may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that privilege. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Generally, a *Miranda* analysis requires the Court to undergo a two-part evaluation. First, it must be determined whether the defendant was in custody at the time the challenged statements were made; second, the Court must consider whether the defendant was subjected to interrogation. *See United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004). Here, the government apparently concedes that Dash was in custody and was not advised of his *Miranda* warnings

---

[4] It is unclear to this Court whether the government intends to introduce the challenged statement during its direct case against Dash. In his original motion to suppress, Dash made only a generalized motion to suppress all statements made during the April 27, 2003 interview. (Docket # 25). Following Mace's testimony at the evidentiary hearing, Dash submitted a post-hearing memorandum which narrowed the scope of his motion to the *pre-Miranda* statement at issue. (Docket # 37). The government, pursuant to this Court's direction, submitted its post-hearing memorandum on the same day as Dash. (Docket # 38). Thus, the government addressed the general admissibility of Dash's post-*Miranda* statements but did not discuss the pre-*Miranda* exchange.

when Mace asked whether he had taken any drugs. Thus, the issue remaining is whether Mace's question amounted to custodial interrogation.

"'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation includes direct questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Rhode Island v. Innis*, 446 U.S. at 301, or that would "produce psychological pressures that [would] subject the individual to the 'will' of his examiner." *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (citations omitted). *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992); *United States v. Thomas*, 961 F. Supp. 43, 44-45 (W.D.N.Y. 1997). This Court believes that any reasonable law enforcement officer should anticipate that questions concerning drug use may well elicit incriminating responses. *See Rhode Island v. Innis*, 446 U.S. at 301.

Further, *Miranda's* booking exception does not relieve the government of its burden in this case. Under that exception, an officer is not required to provide *Miranda* warnings prior to soliciting information concerning a defendant's identity and background. *Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990). *See Rosa v. McCray*, 396 F.3d 210, 221 (2d Cir. 2005) ("collection of biographical or pedigree information . . . does not ordinarily implicate the prophylactic protections of *Miranda*"); *United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992) ("solicitation of pedigree information normally does not amount to custodial interrogation"); *United States v. Minkowitz*, 889 F. Supp. 624, 626 (E.D.N.Y. 1995) ("solicitation of arrestee's identity and background *normally* does not amount to custodial interrogation").

21

In determining whether questioning by a law enforcement officer falls within the booking exception, the Court should consider both the nature of the information sought and whether the questioning served an investigative purpose. *Id.* (citing *United States ex. rel. Hines v. LaVallee*, 521 F.2d 1109, 1113 n.2 (2d Cir. 1975), *cert. denied*, 423 U.S. 1090 (1976); *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989)). According to the Supreme Court, the relevant standard is whether the questions are of the type that an officer "should know are reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496 U.S. at 601 (internal quotation omitted); *Minkowitz*, 889 F. Supp. at 627. "The closer the connection between the crime in question and the information sought, the stronger the inference that the [officer] should have known that his inquiry was 'reasonably likely to elicit an incriminating response . . . .'" *Minkowitz*, 889 F. Supp. at 628 (quoting *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993) (questioning regarding suspect's name in order to connect him with incriminating immigration file did not fall within booking exception), *cert. denied*, 510 U.S. 1026 (1993)).

Here, Mace asked Dash whether he had used any drugs. A positive response could have been incriminating depending upon the substance at issue and whether the drug had been prescribed by a physician. Moreover, Mace also asked whether Dash had "smoked" any drugs; a positive response to that question could only have been incriminating. Although Mace likely intended only to ensure that Dash was not under the influence of narcotics and thus was capable of understanding and waiving his rights, Mace nonetheless should have realized that his question was reasonably likely to elicit an incriminating response. Moreover, Mace could have explored this issue without asking directly whether Dash had used or smoked drugs. On this

22

record, I find that Mace's questions constituted impermissible custodial interrogation, and I

recommend that the government be precluded from introducing Dash's statement that he had

smoked "weed" earlier in the day but was not "high."

**B. Statements Made to Investigator Mazzola on March 23, 2004:** Dash also

seeks suppression of all statements made during his interview by Mazzola on March 23, 2004.

Dash contends that he did not knowingly and voluntarily waive his right against self-

incrimination prior to making statements on that date.

As set forth above, statements obtained during custodial interrogation are

generally inadmissible unless the government can demonstrate that the defendant was first

warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived

that right. *Miranda v. Arizona*, 384 U.S. at 444. In this case, the government argues that Dash

was advised of his rights pursuant to *Miranda* and that he voluntarily waived them.

To establish a valid waiver, the government must prove by a preponderance of the

evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the

defendant had a full awareness of the right being waived and of the consequences of waiving that

right." *United States v. Jaswal*, 47 F.3d. 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475

U.S. 412, 421 (1986)).

The record before this Court, including the testimony of Investigator Mazzola,

demonstrates that Dash was advised of his *Miranda* rights and voluntarily agreed to waive them.

Specifically, Mazzola testified that upon entering the interview room at the Monroe County

Public Safety Building, he introduced himself to Dash and engaged in "small talk" for

approximately one minute on topics unrelated to the case. (Tr.A. 34, 36, 50). The purpose of

such small talk, Mazzola explained, was to obtain pedigree information and to evaluate whether Dash was intoxicated or under the influence of drugs. Once Mazzola was satisfied that Dash was not intoxicated by either drugs or alcohol, he advised him of his *Miranda* warnings by reading verbatim from a *Miranda* notification card. (Tr.A 36, 38, 50). Mazzola then asked Dash whether he understood his rights and whether he was willing to speak. Dash indicated that he understood his rights and that he was willing to waive them and speak to Mazzola. (Tr.A 38). According to Mazzola, at no time during his explanation of the *Miranda* warnings did Dash indicate that he did not understand his rights, nor did he ever request the assistance of an attorney. (Tr.A 38-39).

After advising Dash of his rights, Mazzola conducted an interview relating to the pending weapons charges. Initially, Mazzola listened to Dash and gained a general understanding of his account. Mazzola then instructed Dash to repeat his statements, which Mazzola transcribed. (Tr.A 39). Upon completing the written statements, Officer Venosa entered the room to serve as a witness. Mazzola then sat next to Dash and read the statement aloud as Dash followed along. After his initial reading, Mazzola asked Dash whether the written statement was accurate and whether there was anything he wished to add. Dash supplied additional information, which Mazzola added to the statement. After doing so, Mazzola read the statement aloud for a second time. Dash then acknowledged the statement's accuracy and indicated that there was nothing further he wanted to include. (Tr.A 39, G.Ex. 3A).

Mazzola presented the written statement to Dash and asked him to sign it. Dash replied that he wanted to talk to Marchello Green. Mazzola brought Green into the interview room and allowed Dash to speak with him. Following that conversation, Dash again

24

acknowledged the accuracy of the written statement, but refused to sign it.  (Tr.A 39-40, 72).

Based upon Dash's refusal, Mazzola and Venosa signed the written statement and ended the

interview.

   According to Mazzola, his interview with Dash lasted for approximately forty-five

minutes.  At no time during the interview, Mazzola testified, did Dash appear to be suffering

from a physical ailment, nor did he appear to be under the influence of alcohol or drugs.  Dash

conversed in a understandable manner and never indicated that he did not understand what

Mazzola was saying.  Finally, Mazzola testified that no threats or promises were made to induce

Dash to offer a statement.  (Tr.A 34-35).

   On this record, I find that the government has satisfied its burden of

demonstrating that Dash was advised of his rights under *Miranda* and knowingly and voluntarily

waived such rights.  Accordingly, this Court recommends denial of Dash's motion to suppress

the statements he made to Mazzola on March 23, 2004.


## CONCLUSION

   For the foregoing reasons, it is my recommendation that Dash's motions to

suppress tangible evidence seized from 242 Parkway Street **(Docket # 25)** be **DENIED**.  It is

also my recommendation that Dash's motion to suppress the photographic identification **(Docket**

**# 25)** be **DENIED**.  Finally, it is my recommendation that Dash's motions to suppress the

statement made on April 27, 2003, that he had smoked marijuana earlier in the day be

**GRANTED,** and that his motion to suppress statements made on March 27, 2004 **(Docket # 25)**

be **DENIED**.


MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
April 25, 2005.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_Marian W Payson_
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
April 25, 2005.

_____

[5] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).